737 So.2d 909 (1999)
NATIONAL INFORMATION SERVICES, INC. as Successor in Interest to Resolution Trust Corporation
v.
Warren GOTTSEGEN, Freida Trestman Gottsegen, Noel M. Gilbert and Winifred Berthelot Gilbert.
No. 98-CA-528.
Court of Appeal of Louisiana, Fifth Circuit.
June 1, 1999.
Rehearing Denied July 6, 1999.
*912 Mitchell J. Hoffman, Kermit L. Roux, III, Stanley D. Broome, Lowe, Stein, Hoffman, Allweiss & Hauver, L.L.P., New Orleans, Louisiana, Attorneys for Defendants-Appellants Warren L. Gottsegen and Freida Trestman Gottsegen.
Byrne W. Dyer, III, Gretna, Louisiana, Attorney for Defendants-Appellants Noel M. Gilbert and Winifred Berthelot Gilbert.
William W. Hall, William W. Hall & Associates, Metairie, Louisiana, Attorney for Plaintiff-Appellee, National Information Services, Inc.
Court composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
Defendants appeal a deficiency judgment against them which totals more than $454,000. They contend the trial court erred as a matter of law in finding that the plaintiff proved the amounts owed under the adjustable rate note, in finding that the plaintiffs and the sheriffs appraisals were valid, and in awarding attorney fees of 20% of all amounts due. We affirm.

BACKGROUND
In 1983 Warren L. Gottsegen, Freida Trestman Gottsegen, Noel M. Gilbert, and Winifred Berthelot Gilbert executed a promissory note in the face amount of $349,600 plus interest, payable to the order of Pelican Homestead and Savings Association. The note was secured by a mortgage on property located at 145 Riverside Mall, Baton Rouge, in East Baton Rouge Parish. Pelican Homestead subsequently became insolvent and was taken over by the Resolution Trust Corporation ("RTC") in its capacity as receiver. National Information Services, Inc. ("NIS") acquired the note from the RTC in June 1994.
In November 1994 NIS filed a petition for executory process in East Baton Rouge Parish, alleging the obligors had defaulted on their installments on June 1, 1992. NIS exercised its option as holder of the note to demand payment in full of the note, including principal, interest, late charges, restitution for escrow payments made on the obligors' behalf, attorney's fees as stipulated in the note, and costs. NIS sought executory process over the property mortgaged to secure the note.
Defendant Warren Gottsegen attempted to enjoin the seizure and sale of the mortgaged property, but his petition for injunction was dismissed. On December 13, 1995 the property was sold at a sheriffs sale for $100,633.45 to NIS, as highest bidder. After deduction for costs of the sale and property taxes, the net total from the sheriff's sale was $86,876.79, retained by NIS as a credit on its claim.
On December 21, 1995 NIS filed a petition for deficiency judgment against the Gottsegens and the Gilberts in East Baton Rouge Parish. The defendants excepted to venue and the action for deficiency judgment was transferred to Jefferson Parish.
On March 4, 1997 NIS filed an amended petition in the Jefferson Parish district court, praying for judgment in the amount of $306,691.21, plus accrued interest from May 1, 1992 through October 31, 1995 of $66,130.00, accrued interest from November 1, 1995 to October 31, 1996 of $26,452.12, interest from November 1, 1996 until paid at the rate of 8.78% per annum, late charges in the amount of $4,324.28, restitution for escrow payments in the amount of $1,449.55, attorney's fees of 20% *913 of the total principal and interest due, and all costs of the proceedings, subject to a credit in the amount of $86,876.79 resulting from the sheriff's sale.
After two days of trial, the district court rendered judgment on January 16, 1998 in favor of NIS and against the defendants, in solido, in the amount of $306,691.00 principal, $146,340.00 interest due from May 1, 1992 through October 22, 1997, interest at the rate of 8.876% per annum from October 23, 1997 until paid, accrued late charges of $10,409.00, accrued escrow shortages of $1,449.00, 20% of all sums due as attorney fees, and for all costs of the proceedings, subject to a credit of $86,876.79 resulting from the sheriffs sale.
The defendants have appealed. They contend that the plaintiff failed to prove the amounts owed because the evidence offered by plaintiff was hearsay, that the plaintiff's and the sheriffs appraisals were defective, and that the awarding of attorney's fees of 20% of all amounts due (more than $75,000.00 in this case) is clearly excessive.

I. Deficiency Judgment
When property has been sold under executory process after appraisal and in accordance with statutory provisions governing appraisal, the creditor may obtain a personal judgment against the mortgagor for any deficiency remaining after the application of the net proceeds of sale to the secured debt. La. C.C.P. art. 2771; First Guaranty Bank, Hammond, La. v. Baton Rouge Petroleum Center, Inc., 529 So.2d 834, 841 (La.1987). A creditor may obtain a deficiency judgment against the debtor either by converting the executory proceeding into an ordinary proceeding or by a separate suit, but in either case all of the delays and formalities required in ordinary proceedings must be observed. La. C.C.P. Art. 2772. A deficiency judgment is prohibited if the sale is made without appraisement. La. R.S. 13:4106.
Thus, "[a] creditor seeking to obtain a deficiency judgment has the burden of establishing compliance with two criteria: (1) insufficiency of the sale proceeds to satisfy the underlying debt; and (2) sale of the seized property after appraisal in accordance with the codal and statutory requirements for executory proceedings." First Federal Sav. & Loan Ass'n of New Iberia v. Moss, 616 So.2d 648, 651 (La. 1993).
In this case the debtors seek to establish that the creditor failed to prove the amount of the underlying debt and, thus, could not prove that the sale proceeds were insufficient to satisfy it. Alternatively, they seek to prove the appraisal was not in accordance with legal requirements, making it invalid, so that the creditor is not entitled to a deficiency judgment.

A. Proof of Amounts Owed
The deficiency judgment proceeding is a personal action, in which the defendant has all of the rights of a defendant in an ordinary proceeding and the mortgagee must prove the indebtedness asserted by the usual modes of proof. First Guaranty Bank, supra. The debtor may assert that an obligation is null, or that it has been modified or extinguished, and in such a case the debtor must prove the facts or acts giving rise to the nullity, modification, or extinction. Id. at 842.
Thus, the debtor may assert both negative and affirmative defenses against the deficiency judgment, or the debtor may defend by demonstrating the creditor's failure to prove one of the elements of his case, or by rebutting the existence of such an element. Williams v. Perkins-Siegen Partnership, 93-2131 (La.1/27/95), 649 So.2d 367, 369.
Defendants contend that plaintiffs evidence of the principal and interest due was inadmissible as hearsay and/or for lack of the best evidence. They argue that the documents offered by plaintiff to support the balance remaining on the promissory note were not properly introduced because there was no proper foundation for them, nor were they properly offered under the *914 business records exception to the hearsay rule.
Specifically, defendants assert that the trial court allowed the NIS representative, Lawrence Roe Dodd, to establish the amount owed on the promissory note by "relying entirely on unauthenticated documents purportedly furnished by the Resolution Trust Corporation." In particular, defendants objected to the introduction of Plaintiff's Exhibits 12 and 13.

1. Exhibit 12 (Unpaid Balance)
Plaintiff's Exhibit 12 was two computer printouts listing payments made and balance due on the debt. The only witness regarding the records was the NIS representative, Lawrence Dodd, who testified that when he acquired the note he received the documents from Metec, an asset manager for the RTC in Dallas, Texas. The computer printouts were among the records in the file box of documents he received from the RTC. He admitted he had neither prepared nor generated the documents.
All four defendants admitted (via stipulation or in testimony) that they had signed the promissory note in the amount of $349,600. None of them knew when the last payment on the debt had been made nor what balance was due.
Defendants argue no proper foundation was laid for introduction of these documents because plaintiff failed to offer testimony of a custodian of records from the RTC to establish where the document originated, the RTC's normal course of business in entering the information into the computer, the RTC's maintenance of the computer records once the data was input, or the RTC's efforts to maintain accurate data on their computers. Similarly, defendants assert, plaintiff failed to offer any representative of Pelican Homestead to testify to the amount owed on the date of default.
Defendants argue Dodd could not testify that the records were true and correct because he had no independent knowledge of either Pelican's or RTC's normal course of business, record-keeping policy or data-processing methods. They contend the exhibits are hearsay because NIS failed to produce a qualified person to attest to their authenticity.
La. C.E. Art. 803(6) provides that business records are an exception to the hearsay rule where the proponent can establish they were (1) made at or near the time by, or from information transmitted by, (2) a person with knowledge, (3) made and kept in the course of a regularly conducted business activity, and (4) that it was the regular practice of that business activity to make and to keep the information. The proponent must show these facts by the testimony of the custodian or other qualified witness, as well as show that "the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule." Id.
We conclude that because the defendants admitted the existence of the debt, the amount of the original debt was proven. See Bankers Trust of Louisiana v. Smith, 629 So.2d 525, 527 (La.App. 5 Cir.1993), writ denied, 94-0124 (La.3/11/94), 634 So.2d 393.
Federal courts interpreting the Federal Rules of Evidence, on which our own Code of Evidence is based, have held that bank records or business records which, by the very nature of the documents are regularly kept in the course of business, may be admissible under F.R.E. 803(6), which was the model for La. C.E. Art. 803(6).
"A foundation for admissibility may at times be predicated on judicial notice of the nature of the business and the nature of the records as observed by the court, particularly in the case of bank and similar statements." FDIC v. Staudinger, 797 F.2d 908, 910 (10th Cir.1986). "To be admitted under [the business records] *915 exception, the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness." Itel Capital Corp. v. Cups Coal Company, 707 F.2d 1253, 1259 (11th Cir. 6/23/83).
Under circumstances which demonstrate trustworthiness it is not necessary that the one who kept the record, or even had supervision over their preparation, testify. U.S. v. Flom, 558 F.2d 1179, 1182 (5th Cir.1977). The trial judge has a broad zone of discretion in evidentiary matters. Id.
Rule 803(6) does not require that the records be prepared by the business which has custody of them. Where circumstances indicate that the records are trustworthy, the party seeking to introduce them does not have to present the testimony of the party who kept the record or supervised its preparation. Testimony by the custodian of the record or other qualified witness that the record is authentic and was made and kept in the regular course of business will suffice to support its admission.
U.S. v. Veytia-Bravo, 603 F.2d 1187, 1191-1192 (5th Cir.1979).
We find that Dodd's testimony sufficiently authenticates the records transferred to NIS by the RTC. Accordingly, the trial court did not err in admitting the documents in Exhibit 12.

2. Date of Default
As for the date of default, at trial Noel Gilbert testified he did not know when the last payment was made by any of the defendants or what, if anything, was currently owed on the promissory note. Warren Gottsegen also testified he did not know when the last payment was made or what was currently owed.
In a writ application filed by the Gottsegens early in the proceedings, the relators stated they made monthly payments on the noted until May 4, 1992 and "[n]either the Gottsegens nor the Gilberts made any payments on the note after May 4, 1992." National Information Services, Inc., etc. v. Gottsegen, et al., No. 96 CW 0893 (La. App. 1 Cir., application filed 5/6/96), at page 2. (R. 280.) That statement is a judicial admission effective as to the Gottsegens. Although no such admission from the Gilberts appears in the record, we find the statement, together with the other evidence in the record, sufficiently establishes May 4, 1992 as the date of default.

3. Exhibit 13 (Interest Rate)
Plaintiff's Exhibit 13 was a typewritten page which Dodd had drafted. On the upper half of the page, under the title "Interest Computation," Dodd listed the changes in interest rates since April 1992, alleged to be the time of defendants' default. On the lower half of the page, under the title "Loan Payoff 10/22/97," Dodd set out an itemized computation of the total amount due NIS, setting forth amounts due for principal, interest, late charges accrued and owing to the RTC, late charges due to NIS, escrow shortages owed to the RTC, and the credit resulting from the sheriff's sale, to derive the total allegedly owed to the plaintiff.
Lawrence Dodd testified he established the interest rate changes by consulting a facsimile transmission (fax) from the Federal Housing Finance Board, the successor to the Federal Home Loan Bank Board. The fax document was not entered into evidence. Appellants complain that NIS did not produce an authenticated copy of the index or of the fax, nor any evidence that the Federal Housing Finance Board was actually the successor to the Federal Home Loan Bank Board. NIS did not present any document or witness from the Federal Housing Finance Board or the Federal Home Loan Bank Board to establish that the rates utilized were accurate or that the index used in the alleged fax was the proper index. Defendants assert there was no proper foundation for the interest rates Dodd used.
*916 Defendants argue that Plaintiff's Exhibit 13 is hearsay because Dodd had no personal knowledge of the interest rates about which he testified and because it relied on other hearsay (Exhibit 12 and the Interest Computation section of Exhibit 13).
Plaintiff's Exhibit 13 showed the following computation of interest on the balance:

$306,691.00 Principal
 15,526.00 Interest 5/1/92-10/31/92 (10.125%)
 26,452.00 Interest 11/1/92-10/31/93 (8.625%)
 24,152.00 Interest 11/1/93-10/31/94 (7.875%)
 53,671.00 Interest 11/1/94-10/31/96 (8.625%)
 26,539.00 Interest 11/1/96-10/22/97 (8.875%)

We find no merit to defendants' objections to Dodd's evidence of the interest rate adjustments, however. The existence and status of the Federal Home Loan Bank Board is a matter of which we may take judicial notice. La. C.E. Art. 201(B)(2), (C).
Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (P.L. 101-73, 103 STAT. 183). Also known as FIRREA. FIRREA's purpose was to restore the public's confidence in the savings and loan industry. FIRREA abolished the Federal Savings & Loan Insurance Corporation (FSLIC), and the FDIC was given the responsibility of insuring the deposits of thrift institutions in its place.... FIRREA also abolished the Federal Home Loan Bank Board. Two new agencies, the Federal Housing Finance Board (FHFB) and the Office of Thrift Supervision (OTS), were created to replace it. Finally, FIRREA created the Resolution Trust Corporation (RTC) as a temporary agency of the government. The RTC was given the responsibility of managing and disposing of the assets of failed institutions.
From the internet site of the Federal Deposit Insurance Corporation (FDIC), at http://www.fdic.gov/publish/banklaws.html.[1]
Similarly, the Index on which the interest rate changes are based is a public document of which we may take judicial notice.[2]
The promissory note provides that interest will be charged at a variable rate, as follows:
2. INTEREST
Interest will be charged on that part of outstanding principal which has not been paid.
* * *
Beginning on November 1, 1984, I will pay interest at a yearly rate of one (1%) per cent above the Index of "Contract Interest Rate, Purchase of Previously Occupied Homes, National Average for all Major Types of Lenders" published by the Federal Home Loan Bank Board, as of October 1, 1984, rounded upward to the nearest one-eighth (1/8) of a percent (the First Adjusted Interest Rate). Thereafter, the interest rate that I will pay will change in accordance with Section 4 of this Note until my loan is paid. Interest rate changes may occur on the 1st day of the month beginning on November 1, 1985, and on that day of the month every twelve (12) months thereafter. Each date on which the rate of interest may change will be called a "Change Date."
Section 4 of the note provides:
4. INTEREST RATE CHANGES
(A) The Index
Any changes in the interest rate will be based on changes in an interest rate index which will be called the "Index." *917 The Index is the "Contract Interest Rate, Purchase of Previously Occupied Homes, National Average for all Major Types of Lenders" published by the Federal Home Loan Bank Board.
If the Index ceases to be made available by the publisher, or by any successor to the publisher, the Note Holder will set the Note interest rate by using a comparable index.
(B) Setting the New Interest Rate.
To set the new interest rate, the Note Holder will determine the change between the Base Index figure and the Current Index figure. The base Index figure is the index figure as of October 1, 1984. The Current Index figure is the most recent Index figure available 30 days prior to each Change Date. If the amount of the change is less than one-eighth of one percentage point, the change will be rounded to zero. If the amount of the change is one-eighth of one percentage point or more, the Note Holder will round the amount of the change to the nearest one-eighth of one percentage point.
If the Current Index figure is larger than the Base Index figure, the Note Holder will add the rounded amount of the change to the First Adjusted Interest Rate. If the Current Index figure is smaller than the Base Index figure, the Note Holder will subtract the rounded amount of the change from the First Adjusted Interest Rate. The result of this addition or subtraction will be the preliminary rate. If there is no change between the Base Index figure and the Current Index figure after rounding, the First Adjusted Interest Rate will be the preliminary rate.
According to the Federal Housing Finance Board's "Monthly Interest Rate Survey, ARM History, National Average Contract Mortgage Rate For the Purchase of Previously Occupied Homes by Combined Lenders," the interest rates set out in Plaintiffs Exhibit 13 are correct when calculated according to the specifications set out in the note.

B. Appraisal
An appraisal which is not true and just is an invalid appraisal. La.R.S. 13:4365(A). Bank of Commerce and Trust Co. v. Landry, 610 So.2d 927, 931. When the debtor alleges that the appraisal was not true and just, the fact that the judicial sale has occurred does not preclude the debtor from challenging the validity of the appraisal in a deficiency judgment action. Bank of Commerce and Trust Co. v. Landry, supra, at 930 (La.App. 1 Cir.1992).
"The Deficiency Judgment Act protects debtors from creditors selling mortgaged property at a low price and pursuing the debtor for the remaining obligation. As such, it is the creditor who bears the burden of complying with the appraisal requirements." Bank of Commerce and Trust Co. v. Landry, supra.
The record establishes that the appraiser for NIS appraised the property at $99,500, while the defendants' appraiser placed the value at $250,000. Pursuant to La. R.S. 13:4365, the sheriff appointed a third appraiser, who valued the property at $108,000 because the building had been vacant and boarded up for several years and was located in an area in which similarly-situated buildings had been demolished and their spaces used as commercial parking lots.
At the sheriffs auction the only parties to bid on the property were Lawrence Dodd, on behalf of NIS, and David Fortier, a representative of Warren Gottsegen. Ultimately NIS purchased the property for $105,000. After deducting costs of the sheriffs sale and unpaid property taxes, $86,876.79 was credited to defendants' balance on the note.
Appellants contend the plaintiff's and sheriffs appraisals were defective. They assert that plaintiff's appraiser, Charles Anderson, was unqualified and failed to inspect the property with due diligence prior to valuing it, resulting in an unjustly *918 low appraisal. They contend that if Anderson's appraisal been properly performed by a competent appraiser, it would probably have been within the averaging limits with the Gottsegens' appraisal as established by La. R.S. 13:4365 and the sheriff would not have had to appoint a third appraiser.
La. R.S. 13:4365 sets the following requirements for appraisals for judicial sales:
A. The appraisers shall take an oath to make a true and just appraisal of the property.
B. If the appraisers cannot agree, and (1) the difference in value between the two appraisals does not exceed two hundred and fifty thousand dollars, and (2) the value assigned by the lower of the two appraisers is at least ninety percent of the value assigned by the higher of the two appraisers, then the sheriff shall average the two figures and use the average as the appraised value for purposes of determining the opening bid. In those cases where the two appraisers do not agree and the values are not within the averaging limits, then the sheriff shall appoint a third appraiser, who shall also be sworn, and whose decision shall be final.
C. The property seized must be appraised with such minuteness that it can be sold together or separately.
The argument as to plaintiffs appraiser is irrelevant. La. R.S. 13:4365 provides that when the appraisers for the parties cannot agree and the sheriff appoints a third appraiser, the third appraiser's decision shall be final. Because the sheriffs appraiser has the final decision, that is the only appraisal that should be challenged by the debtor in a subsequent action for deficiency judgment.
The appraiser appointed by the sheriff was John Lejeune. Defendants do not challenge his qualifications, but they assert he failed to make a proper appraisal because his methods were inadequate.
Lejeune testified he did not go inside the building. He examined the exterior for about an hour. He described it as multi-storied brick and masonry, with a roof he assumed was built-up. After he consulted computerized data he concluded that the land would be worth more if it was vacant. He said the building did not contribute to the value of the land. He relied on data from a computerized data base and a real estate data service.
Lejeune testified he looked for sales in the area within the past three years before 1995. His fair market value estimate of $108,000 was based on $12.00 per square foot times the number of square feet, allowing $34,000 to $36,000 to remove the building from the site.
Lejeune admitted that this appraisal did not meet the minimum standards for appraisals conducted for the federal government or for the highway department. He also said that if he had been doing an appraisal for the state or for a financial institution they would have gotten "the whole ball of wax." He explained his appraisals for sheriffs sales are different because he is paid only $65 for them. A thorough appraisal would cost more. He admitted that for a mortgage loan appraisal, he would inspect the interior and he would do a market analysis and an income analysis. For mortgage loans, he stated, "there are certain guidelines that are required of state certified appraisers and that's what you have to do."
Defendants cross-examined Lejeune about whether he had considered sales of other nearby properties that sold for considerably more than this one, specifically at 161 Third Street, 343 Third Street and 236-238 Third Street. 161 Third Street sold for $300,000 two days before the sheriffs sale. 343 Third Street was valued at $58.21 per square foot in November 1995, compared to Lejeune's valuation of the subject property at $16 per square foot (less $4 per square foot for demolition expense). In addition, he failed to examine 236-238 Third Street, which sold for *919 $250,000 in August 1995. Defendants assert this evidence also rebuts Lejeune's statement that the area was in a state of decline.
Defendants' appraiser, Larry Bankston, arrived at a value of $250,000 for the property. Defendants did not, however, call him to testify. The only evidence of his appraisal is his return to the sheriff.
A debtor's mere supposition or argument that the appraisal is or was unfairly or unjustly prejudicial to the debtor and thus invalid, without some evidence to establish that fact, will not be deemed to satisfy the substantial burden of proof and rebut the presumption that the sale was conducted as the law directs. American Bank and Trust Co. v. Price, 28,018 (La. App. 2 Cir. 4/3/96), 688 So.2d 536, 543.
Defendants' failure to present affirmative evidence of their contentions regarding Lejeune's appraisal is insufficient to carry their heavy burden of setting aside the presumption of regularity and validity that attaches to proceedings in sheriffs sales.

C. Attorney Fees
The promissory note contains the following provisions on attorney fees:
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all its reasonable costs and expenses.... Those expenses may include, for example, attorney's fees of 20% of the amounts that I owe under this Note.
The act of mortgage which secures the promissory note provides for attorney fees as follows:
Borrower hereby confesses judgment in favor of Lender and any future holder of the Note in the full amount of all sums secured by this Mortgage, including, but not limited to, attorney's fees of 20% of the sums due under the Note.
In his reasons for judgment the trial judge found, "Upon reviewing the entire record of these proceedings and considering the complexity of the issues involved, an award of attorney fees amounting to 20% of all sums due as provided by the Adjustable Rate Note and Act of Mortgage is reasonable."
The amount the court found due on the note, after application of the credit from the sheriffs sale, totaled $378,521.21 on the date of trial (subject to increase for interest accruing from October 23, 1997 until paid). Twenty percent of that amount is more than $75,000.
Appellants assert the fee awarded to plaintiff is grossly out of proportion with the fees charged for similar services by other attorneys in this area and to the fees actually incurred by plaintiff. They argue that the legal position involved in this matter is neither novel nor difficult, that the skill required to perform this legal service was minimal, and that the amount at issue is completely out of proportion with the amount of attorney's fees awarded.
Attorney fees are subject to review and control by the courts. Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102, 105 (La.1978). The prohibition against a lawyer collecting a clearly excessive fee cannot be abrogated by a provision in a note fixing the amount of attorney fees as a percentage of the amount to be collected. Leenerts Farms, Inc. v. Rogers, 421 So.2d 216, 219 (La.1982). Therefore, despite such a provision, courts may inquire into the reasonableness of the fee. Id.
Similarly, the prohibition against a clearly excessive attorney fee cannot be abrogated by a law fixing the amount of attorney fees as a percentage of the amount to be collected, City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397, 401 (La.1987), nor by a law such as La. C.C. art. 2000 which attempts to regulate attorney fees. Central Progressive Bank v. Bradley, 502 So.2d 1017 (La.1987). Such law and provisions will not be enforced when the attorney fees thus fixed *920 are excessive and unreasonable. Leenerts, supra; City of Baton Rouge v. Stauffer, supra; Central Progressive Bank, supra.
Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.
State, Dept. of Transp. and Development v. Williamson, 597 So.2d 439, 442 (La. 1992). These commonly applied guidelines are derived from the Rules of Professional Conduct of the state bar association. State Bar Articles of Incorporation, Art. 16, Rules of Prof.Conduct, Rule 1.5(a), La. R.S. foll. 37:222.
Most of these particulars usually can be determined by the trial court and this court by reviewing the pleadings and evidence in the record in the case. In re Tutorship of Property of Huddleston, 95-97 (La.App. 5 Cir. 4/25/95), 655 So.2d 416, 419. The actual time expended and the complexity of the case are the dominant factors in a court's determination of reasonableness or excessiveness. First Nat. Bank of Commerce v. Pontchartrain Leasing Co., Inc., 519 So.2d 262, 264 (La. App. 5 Cir.1988), writ denied, 520 So.2d 754 (La.1988). When the services of an attorney are evident from the record, proof of services is not necessary. Federal Services Corp. v. Mule-Durel, Inc., 95-2192 (La.App. 4 Cir. 5/15/96), 676 So.2d 597, 600, writ denied, 96-1562 (La.9/27/96) 679 So.2d 1346.
[R]eview of purportedly excessive attorney fees should be tempered with judicial restraint. The courts should not be in the business of setting fees. Article 2000 authorizes a valid contract for attorney fees and the courts should not interfere with that contract unless there is a "clearly excessive fee" involved.... We interpret that term to mean so grossly out of proportion with the fees charged for similar services by other attorneys in the locale as to constitute an unquestionable abuse of the attorney's professional responsibilities to the public.
Gibson v. Burns, 505 So.2d 66, 69 (La.App. 4 Cir.1987).
Lawrence Dodd testified he is the sole stockholder and only officer of NIS. He is also an attorney and he supervised the efforts of various attorneys on his behalf throughout the proceedings (Randal Tannahill, Renee Chatelain, Travis Lebleu and William Hall). The record of the proceedings from both East Baton Rouge Parish and Jefferson Parish was entered into evidence with respect to the services of all the attorneys. In addition, with respect to Hall (who represented plaintiff in the Jefferson Parish portion of the litigation), Dodd testified he had a fee arrangement for 25% of the gross amounts collected.
The record reflects this has been a lengthy and protracted litigation, vigorously opposed by defendants. Attorneys for NIS filed numerous pleadings and made several court appearances to argue exceptions and motions, as well as spending two days in trial and responding to this appeal. The case has been significantly more complex than typical executory process/deficiency judgment proceedings.
Based on the record we cannot say the trial court erred in finding the case supports a fee of 20% of all sums due.

DECREE
For the foregoing reasons, the judgment is affirmed. Costs of the appeal are assessed against the appellants.
AFFIRMED.
CANNELLA, J., DISSENTS WITH REASONS.
*921 CANNELLA, J. DISSENTING WITH REASONS.
I disagree that plaintiff proved the amount of the debt owed. Dodd was not a "qualified witness" under the business records exception to the hearsay rule, La.C.E. art. 803(6) and could not testify to either the RTC's or Pelican's normal course of business.
In Ruddock v. Jefferson Parish Fire Civil Service Bd., 96-831 (La.App. 5th Cir. 1/28/97), 688 So.2d 112, 116, this circuit adopted the definition of a "qualified witness" set forth in Cole Oil & Tire Co., Inc. v. Davis, 567 So.2d 122, 129 (La.App. 2nd Cir.1990). The Cole court stated as follows:
The witness laying the foundation for admissibility of business records need not have been the preparer of the records. The person who keeps the books and records and makes the entries need not testify if a person who is in a position to attest to the authenticity of the records is present to testify. U.S. v. Fendley, 522 F.2d 181, 185 (5th Cir. 1975). Nothing in the Code of Evidence specifically requires either that the foundation witness be able to personally attest to the accuracy of the information contained in the documents, or that he personally prepared the documents. Indeed, Article 803 specifically eliminates these requirements. See Fendley, supra. Compare under former law Vining v. State Farm Life Ins. Co., 409 So.2d 1306 (La.App. 2d Cir.1982), writ denied.
A party offering business records evidence is no longer generally required to prove the declarant's unavailability or that production of such persons would be a `needless burden.' Moreover, the business records sought to be introduced at trial no longer must be the `first collected records available.' The former requirements no longer constrain the required `records custodian or other qualified witness' who testifies to the foundation requirements. See and compare C.E. Art. 803(6) and Vining, Herlitz [Construction Co. v. Clegg Concrete, Inc., 378 So.2d 1002 (La.App. 1st Cir. 1979)], cited supra.
The party who seeks to introduce written evidence must in some way, nonetheless, authenticate it by a qualified witness. Under Art. 803(6), it is essential that a custodian or other qualified witness testimonially explain the record-keeping procedures of the business and thus lay the foundation for the admissibility of the records. See, e.g., Rosenberg v. Collins, 624 F.2d 659, 665 (5th Cir.1980). That witness must, however, be familiar with and able to testify from personal knowledge about the bookkeeping and accounting procedures of the entity whose business records are sought to be introduced. (Emphasis added.)
The business records are hearsay. In this case, Dodd had no personal knowledge of the record keeping of either the RTC or Pelican. Since there was no proper foundation for the introduction of those documents as business records, they are not excluded from hearsay under C.E. art. 803(6). Therefore, plaintiff failed to prove the amount of the debt that was owed.
NOTES
[1] We have not found a previous citation to an Internet site in a judicial opinion in this state, but we see no reason why a government Internet site should not be considered as much an official government document as any printed pamphlet or other materials. Internet sites are available to the general public, as much or more than a document or book in a law library.
[2] Our research found the Index on the Internet at the website of the Federal Housing Finance Board at http:// www.fhfb.gov/idx_hist.htm.